IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| JOHN A. EARHEART, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:19-cv-01107 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| CENTRAL TRANSPORT LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 51, "Motion"), supported by an accompanying Memorandum of Law. (Doc. No. 52). Plaintiff filed a response (Doc. No. 61, "Response"), and Defendant filed a reply (Doc. No. 63, "Reply"). For the reasons stated herein, Defendant's Motion will be **GRANTED**.

### FACTUAL BACKGROUND[1]

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 61) and Defendant's Response to Plaintiff's Local Rule 56.01(c)(3) Statement. (Doc. No. 64). Facts that are stated herein without qualification are undisputed and treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

In its response to Plaintiff's additional statement of material facts, Defendant has requested that this Court disregard Plaintiff's statement of facts in ruling on this Motion because Plaintiff failed to comply with Local Rule 56.01(c)(3), which requires the statement of material facts to put each fact in a separate, numbered paragraph. (Doc. No. 64 at 1-2). Defendant notes that Plaintiff's first statement of fact consists of a question followed by five paragraphs of additional statements, with a single "Response" at the end of the five paragraphs. (*Id.* at 1). This pattern continues throughout the document. According to Defendant, the use of questions, rather than statements, "begs the question" what is the fact that Plaintiff disputes. (*Id.* at 2).

Defendant further explains that this is not the first time that Plaintiff's counsel has failed to comply with Local Rules and cites a separate case Plaintiff's counsel filed before this Court in 2013. (*Id.* at 1) (citing

## I.    Plaintiff's Employment with Defendant

In April 2011, Plaintiff began working as a pickup and delivery ("P&D") driver for the company that would eventually become Central Transport LLC ("Central" or "Defendant"). (Doc. No. 61 at 1). In his position as a P&D driver, Plaintiff was responsible for picking up and delivering freight in a semi-truck throughout the greater Nashville, Tennessee area. (*Id.*). Plaintiff's duties as a P&D driver included not only driving, but also lifting and carrying packages. (*Id.* at 2). According to Plaintiff, lifting more than twenty pounds "obviously happen[ed]" depending on the day. (*Id.*).

## II.    Plaintiff's Injury, Subsequent Disability, and Medical Treatment

On or about August 15, 2016, Plaintiff sustained a work-related injury when he fell while unloading his trailer at one of Defendant's client's facilities in Gallatin, Tennessee. (*Id.*) Specifically, Plaintiff attempted to jump into his trailer and slipped, causing him to fall "on [his] right knee, . . . push[ing] [his] knee up into [his] chest." (*Id.*). That same evening, Plaintiff reported his injury to Defendant. (*Id.*). The following day, Plaintiff sought medical treatment at Concentra Medical Center. (*Id.*).

Concentra[2] evaluated Plaintiff's hip and cleared him to return to "modified work activity" with the following restrictions: Plaintiff "may lift up to 20 pounds frequently; may push/pull up to

---

*Graves v. Mid South Waffles, Inc.*, Case No. 3:12-cv-0414, at Doc. No. 40 (M.D. Tenn. 2013)). In that case, Plaintiff's counsel used a similar format for a statement of additional facts that contained paragraphs of additional facts under each "header" question. In addition to illustrating a clear disregard for this Court's local rules, Plaintiff's counsel's question and multi-statement paragraph formatting makes it difficult for both the Court and opposing party to decipher what the actual alleged statement of material fact is.

Nonetheless, the Court presently declines to disregard Plaintiff's additional statement of facts due to non-compliance with the Local Rules. However, Plaintiff's counsel is encouraged to ensure strict compliance in future filings lest the undersigned (or another) judge be less forgiving.

[2] It is apparent that Concentra's actions referred to herein must have been undertaken on Concentra's behalf by one or more of its employees. Often, the identity of the applicable Concentra employees is left unclear by the parties, who instead refer generically to the actions of "Concentra." Where the parties have proceeded this way, the Court will do likewise herein,

20 pounds frequently; and may *not* drive company vehicle due to functional limitations." (*Id.*) (emphasis added). Because of these medical restrictions, Plaintiff was unable to perform his regular job functions as a P&D driver and returned to work at Central in a light duty capacity, where he performed clerical work, such as answering phones, filing paperwork, and performing yard checks at Defendant's Nashville terminal. (*Id.* at 3). Around that same time, Plaintiff applied for and received workers' compensation benefits through Cherokee Insurance Company ("Cherokee"), Defendant's insurance carrier for workers' compensation claims. (*Id.*).

In November 2016, Concentra referred Plaintiff to a hip specialist, Dr. Thomas Byrd, who became his treating physician. (Doc. Nos. 52 at 4; 60 at 2). On March 28, 2017, Plaintiff's lifting restriction was changed from twenty pounds to thirty pounds maximum, but Plaintiff's no-driving restriction were continued, and Plaintiff was further restricted from climbing. (Doc. No. 61 at 3). After undergoing noninvasive treatment, which failed to improve his condition, Plaintiff elected to undergo a fluoroscopy on his right hip on April 19, 2017. (*Id.* at 4). Following Plaintiff's hip surgery, he was out of work entirely for eleven months until March 2018. (*Id.*).

On or about February 27, 2018, Dr. Byrd cleared Plaintiff to return to light duty work with the following restrictions: "no bending, squatting, climbing, reaching or lifting greater than 20 pounds; no prolonged standing or walking with a 10 [to] 15 minute break every hour; and no prolonged sitting with a 10 [to] 15 minute break every 2 hours." (*Id.*). Plaintiff remained on these medical restrictions for the rest of his employment at Central. (*Id.*).

Upon returning to work at Central in March 2018, Plaintiff performed the same light duty work—answering phones, filing paperwork, and performing yard checks—that he did before his hip surgery, with the addition of some billing-related tasks. (*Id.* at 5) In or around June 2018, Plaintiff accepted an alternative light duty work assignment for Defendant at FiftyForward

Donelson Station ("FiftyForward").[3] (*Id.*). While Plaintiff worked offsite at FiftyForward, he remained Defendant's employee and performed much of the same light duty work that he previously performed at Central, including answering phones, handling member event signups, taking payments, and other clerical work. (*Id.*). During his time at FiftyForward, Plaintiff was still recovering from his hip injury and agreed to perform tasks that were consistent with the restrictions assigned by his medical provider. (*Id.*).

In or around May 2018, when Plaintiff's hip treatment "wasn't going anywhere," Dr. Byrd recommended that Plaintiff have his back examined. (*Id.*). Plaintiff was evaluated by Dr. Malcolm Baxter, an independent medical examiner ("IME"), on October 25, 2018. (*Id.* at 6). According to Dr. Baxter's report, Plaintiff did not require any further hip treatment, because "any further treatment for the hip would be based on an arthritic-type diagnosis, which [Plaintiff] clearly had prior to his injury." (*Id.*). Plaintiff understood that Dr. Baxter was continuing the same medical restrictions, including the no-driving restriction, that were initially set by Concentra. (*Id.* at 7). On November 19, 2018, Plaintiff received a nerve evaluation from Dr. William Strickland, who found "no objective evidence of a work-related injury from a neurologic perspective." (*Id.*).

## III.    Plaintiff's Separation[4]

While performing light-duty work at FiftyForward on December 18, 2018, Plaintiff received a call in the morning from Mike Gehringer, the claims adjuster from Cherokee who

---

[3] Neither party offers an explanation as to how FiftyForward Donelson Station is related to Central Transport LLC. However, it is clear there must be some relationship, as Plaintiff remained Defendant's employee while working at FiftyForward. (Doc. No. 61 at 5).

[4] The Court recognize that the parties dispute whether the word "termination" accurately describes what happened at the end of Plaintiff's employment with Defendant. Though the fact that Plaintiff's employment with Defendant came to an end is undisputed, Defendant contends that Plaintiff voluntarily resigned, while Plaintiff argues he was terminated. For that reason, the Court herein will use the term "separation" to make neutral references to the cessation of Plaintiff's employment.

handled Plaintiff's workers' compensation claim. (*Id.* at 8). Gehringer informed Plaintiff that he was "released" to his regular duties and instructed Plaintiff to contact Defendant for more information. (*Id.*; Doc. No. 64 at 7). After his call with Gehringer, Plaintiff immediately spoke with Billy Dodson, one of Plaintiff's supervisors at Central, and informed Dodson that he would come back to work the next day. (Doc. Nos. 61 at 8; 64 at 5, 15). Defendant contends that Dodson then communicated his conversation with Plaintiff to Dean Kuska. (Doc. No. 52 at 6). Kuska is the individual responsible for processing workers' compensation claims at Central. (Doc. Nos. 60 at 14; 64 at 16). After speaking with Dodson, Plaintiff alleges, he then spoke with Matt Combs, Central's Regional Employer Relations and Staffing Manager and Human Resources manager for the Nashville terminal, (Doc. No. 64 at 4), and Steve Skelley, Plaintiff's afternoon shift supervisor in 2016. (*Id.*). Plaintiff alleges that he separately informed Combs and Skelley that he would take paid time off ("PTO") on December 19, 20, and 21. (Doc. No. 61 at 10). Both Combs and Skelley testified that they did not recall speaking to Plaintiff on December 18, 2018, and that they would not have advised him to take PTO as they did not handle those requests. (*Id.*). Defendant contends that Kuska never received any PTO requests from Plaintiff, nor from anyone making a request on Plaintiff's behalf, for December 19, 20, or 21.[5] (Doc. No. 61 at 11).

Plaintiff did not report to Central on December 19, 20, or 21, 2018 (*Id.*). According to Central's Attendance Policy, which is "conspicuously" posted in its driver guide, on the employee notice board at the terminal, and on a "fair treatment" poster at the terminal, Central considers three consecutive no-call/no-shows to be a voluntary resignation. (*Id.* at 11-12). After Plaintiff did

---

[5] Plaintiff disputes this fact, citing to his timesheet for the week of December 17, 2018, where Plaintiff has written in "PTO" on December 19, 20, and 21. (Doc. Nos. 61 at 11; 61-7). Plaintiff contends the timesheet was to be faxed to an administrator in Central's corporate safety department and to Gehringer (*id.*) but fails to explain why the timesheet and the fact that it was to be faxed to these individuals makes it disputed that Kuska in particular never received any PTO requests from Plaintiff.

not show up to work for three days, Defendant stated that it considered Plaintiff a no-call/no show under its attendance policy and processed Plaintiff as a voluntary resignation. (Doc. No. 64 at 13, 15). Nonetheless, Plaintiff reported to Central on December 26, 2018, where he worked 3.5 hours before being told to go home. (*Id.* at 20). On January 2, 2019, Plaintiff received a letter from Defendant informing him of his processed separation.[6] (Doc. Nos. 52 at 8; 60 at 6).

Plaintiff described his medical condition at the time of his separation as involving "back and hip pain" that affected his everyday quality of life, "from climbing stairs and standing, sitting, and walking too long." (Doc. No. 61 at 22). At the time of his separation, Plaintiff remained on the same medical restrictions set by Dr. Byrd in February 2018. (*Id.*). Because of his medical restrictions and physical limitations, Plaintiff was unable to and did not drive a truck or perform the essential functions of his job as a P&D driver from the date of his injury in August 2016 through the date of his separation with Defendant. (*Id.* at 23).

## PROCEDURAL BACKGROUND

Plaintiff filed the present action in Davidson Circuit Court on November 6, 2019. (Doc. No. 1-1). The original complaint listed two causes of action: retaliatory discharge under the Tennessee Workers' Compensation Law a/k/a Tennessee Workers' Compensation Act ("TWCA") and disability discrimination under the Tennessee Disability Act ("TDA"). (*Id.* at 8-9). On December 11, 2019, Defendant removed the case to federal court based on diversity jurisdiction. (Doc. No 1). Plaintiff then filed an amended complaint ("Amended Complaint") on July 7, 2020 in which Plaintiff restated the two original claims and added an Americans with Disabilities Act

---

[6] The letter noted that Defendant had processed Plaintiff in its system as a voluntary resignation, with his last day being December 13, 2018. (Doc. No. 60-8 at 1). However, Defendant has acknowledged that this date was erroneous "due to a clerical error" and Plaintiff performed light duty at FiftyForward until December 18. 2018. (Doc. No. 52 at 8, n.5).

("ADA") claim. (Doc. No. 29 at ¶ 32). Plaintiff specifically alleges Defendant terminated him "'for filing a work comp claim' and 'need[ing] treatment for [his] back.'" (Doc. No. 61 at 23).

Defendant filed the present Motion on June 18, 2021 requesting summary judgment as to Plaintiff's ADA disability discrimination claim and retaliatory discharge claim. (Doc. No. 52). Defendant did not move for summary judgment as to Plaintiff's TDA claim, arguing in its Reply that "Plaintiff did not maintain any separate TDA claim" in his Amended Complaint. (Doc. No. 63 at 2). However, the Court found that Plaintiff's Amended Complaint did appear to allege both an ADA claim and a TDA claim. Subsequently, on March 28, 2022, the Court notified the parties that it was considering granting summary judgment *sua sponte* as to Plaintiff's TDA claim on the basis that Plaintiff could not raise a genuine dispute as to whether he is "qualified for [his] position." (Doc. No. 66). In accordance with Sixth Circuit practice, the Court provided Plaintiff the opportunity to submit additional briefing and/or evidence on the TDA claim. *See Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000) (citing *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995)). On April 15, 2022, Plaintiff submitted both additional briefing (Doc. No. 67) and evidence (Doc. No. 68), and his TDA claim is now ripe for review.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary

under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Id*. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[7]

Consistent with the above observations made specifically about a defendant-movant seeking summary judgment on a plaintiff's claims, any party asserting that a fact cannot be or genuinely is disputed—i.e., any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R.

---

[7] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The Court will take a moment here to discuss the *McDonnell Douglas* standard and its applicability to motions for summary judgment in the context of employment-discrimination claims in the federal judicial system. The burden-shifting approach in *McDonnell Douglas* applies only to discrimination or retaliation claims premised on indirect-evidence.[8] *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). The undersigned has recently explained:

> When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of employment discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends on whether the defendant-movant seeks to prevail at the first step, or at the second and third step, or at both the first step and the second and third step . . .

> To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas.*

> At the second step, the defendant-movant has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful

---

[8] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). Indirect evidence, accordingly, is evidence that requires the court to make inferences to conclude that retaliation or discrimination was the motivator for an adverse employment action.

discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 891836, at *9-10 (M.D. Tenn. Mar. 25, 2022). As will be further discussed below, Plaintiff's claims are premised (solely) on indirect evidence and thus subject to the *McDonnell Douglas* framework.

## DISCUSSION

### I.     Plaintiff's ADA Claim for Disability Discrimination

The ADA, as amended by the Americans with Disabilities Amendments Act, prohibits employers from discriminating against a qualified individual on the basis of disability. 42 U.S.C. § 12112. Plaintiff's Amended Complaint alleges Defendant discriminated against him due to his disability when Defendant allegedly terminated him from his position of employment. Disability discrimination claims can be premised on direct or indirect evidence, but here Plaintiff makes no argument that he has direct evidence of disability discrimination, and the Court did not find any in its review. Accordingly, Plaintiff's disability discrimination claim will be evaluated solely under the indirect-evidence framework of *McDonnell Douglas* as outlined above.

To establish an indirect-evidence *prima facie* case of ADA disability discrimination, a plaintiff must show:

> (1) she was "disabled" within the meaning of the Act; (2) she was qualified for the position, with or without an accommodation; (3) she suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced her or was selected for the position that the disabled person had sought

*Kocsis v. Multi-Care Management, Inc.*, 97 F. 3d 876, 882 (6th Cir, 1996). Although *Kocsis* did not so state, later cases have clarified that the plaintiff must also show that the defendant knew of the plaintiff's disability. *See, e.g.*, *Becker v. Elmwood Loc. Sch. Dist.*, 519 F. App'x 339, 342 (6th

Cir. 2013) (citing *Whitfield v. v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011)).[9] Also, although *Kocsis* did not so state, a plaintiff who (though not qualified without an accommodation) seeks to establish the second element by showing that he is qualified *with* an accommodation must show that the accommodation is *reasonable*; in other words, the reference to "an accommodation" in the second element is actually a reference only to a "reasonable" accommodation. *See Whitfield*, 639 F.3d at 259.

When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of disability discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends in part on whether the defendant-movant seeks to prevail at the first step or at the second and third step, or both the first and the second and third steps, of *McDonnell Douglas*. Here, Defendant attempts to prevail at the first step and at the second and third step. Defendant first argues that Plaintiff cannot raise a genuine dispute as to the second element of an indirect-evidence case of disability discrimination (that Plaintiff is qualified to perform the essential functions of the P&D driver position).

To prevail at the first step, Defendant must meet its initial burden of showing preliminarily an absence of evidence from which a reasonable jury could find the plaintiff established a *prima*

---

[9] In these cases, the Sixth Circuit used the term "qualified," rather than "otherwise qualified," to refer to the second element. In other cases, the Sixth Circuit used the term "otherwise qualified" in such context. For particular reasons the undersigned need not dwell on herein, the undersigned has concluded that with respect to the elements of an indirect-evidence *prima facie* case of disability discrimination under the ADA, the applicable concept is the plaintiff being *qualified* (with or without reasonable accommodation). In that context, the concept of the plaintiff being *otherwise* qualified (with or without reasonable accommodation) is simply inapplicable, and if a court uses the term "otherwise qualified" to define the second element, the court is being inexact and could not properly mean (and typically clearly does not intend to mean) anything other than "qualified" (with or without reasonable accommodation). The undersigned cites *Kocsis*, despite its omissions reflected above, because it is one of those cases that correctly omits the word "otherwise."

*facie* case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). In this case, that means an absence of evidence that Plaintiff was "qualified" for the position. If Defendant does so, then the burden shifts to Plaintiff to show that at trial he could prove he was "qualified" for his position. "An employee is qualified for her position if she can perform the essential functions of her job with or without a reasonable accommodation." *Thompson v. Fresh Prod.*, LLC, 985 F.3d 509, 524 (6th Cir. 2021) (citing 42 U.S.C. § 12111(8)).

To meet its initial burden, Defendant points to Plaintiff's own deposition admissions where he acknowledges that he could not perform the essential functions of a P&D driver. (Doc. No. 54-1 at 13, 40-41). Defendant also cites to Plaintiff's work restrictions, which prevented him from driving a company vehicle, from lifting more than 20 pounds, and from sitting or standing for prolonged periods. (Doc. Nos. 54-11 at 4, 54-13 at 5). In conjunction, Defendant cites to Plaintiff's deposition where he acknowledges that a position as a P&D driver necessarily involved driving and having to lift more than 20 pounds. (Doc. Nos. 54-1 at 3-5, 46-47).

A "function may be essential because the reason the position exists is to perform that function." 29 C.F.R. § 1630.2(n)(2)(i); *Denczak v. Ford Motor Co.*, 215 F. App'x 442, 445 (6th Cir. 2007) (holding that a production quota was an essential function on an assembly line position even though the defendant did not provide a written description of the job because "common sense . . . supports the point"). Accordingly, the Court finds that Defendant has pointed to enough evidence to suggest that Plaintiff will not be able to raise a genuine dispute as to whether he was "qualified" for the P&D driver position because he will be unable to show he could perform the essential functions of the job. Notably, the question generally is whether the plaintiff could perform the essential functions *with or without* reasonable accommodation, but here the immediate question is whether Plaintiff could perform the essential functions *without* reasonable accommodation; there

is no evidence Plaintiff ever proposed a reasonable accommodation to Defendant prior to his separation, and thus for the Court to require Defendant, in order to be credited with meeting its initial burden, to have refuted that Plaintiff could perform the essential functions with a (hypothetical and unspecified) reasonable accommodation would be non-sensical.[10] The burden thus shifts to Plaintiff to make a *prima facie* showing as to the "qualified" element of his indirect-evidence disability discrimination claim.

Plaintiff's Response to Defendant's argument for summary judgment on the ADA discrimination claim is confusing and consists primarily of irrelevant arguments. Plaintiff first appears to discuss why an ADA disability discrimination claim can be paired with a claim under the TWCA, a point Defendant does not even dispute. Next, Plaintiff argues that "[t]here is a disputed question of fact as to whether Central Transport has a release to full duty requirement before returning a truck driver employee to work." (Doc. No. 60 at 21). Again, the Court fails to see the relevance of this argument to the challenged element of Plaintiff's indirect-evidence *prima facie* case of disability discrimination. Plaintiff additionally mentions that Defendant's reasons for terminating him were pretextual, that his disability was only temporary, and that there was no interactive process. However, noticeably lacking from the many arguments in Plaintiff's Response, is the only argument that matters: that Plaintiff was (or at least a reasonable jury could find that Plaintiff was) qualified to be a P&D driver because he could perform the essential functions of the position. If Plaintiff does not make and prevail on this argument, he suffers summary judgment, irrespective of any other points he wishes to make and without even reaching steps two and three

---

[10] That is not necessarily to say that Plaintiff, in his Response, cannot meet his resulting burden as the non-movant by identifying a reasonable accommodation, but he would also need to provide evidence in the Response that such accommodation *would have* allowed him to perform the essential functions of his position. And Plaintiff in this case has not identified a potential reasonable accommodation in his Response, let alone provided evidence sufficient for a jury to find that said accommodation would have allowed him to perform the essential functions of a P&D driver.

of *McDonnell Douglas*. Plaintiff completely fails to make this argument, and thus fails to raise a genuine issue as to whether he is "qualified." Defendant's Motion will be granted as to Plaintiff's ADA disability discrimination claim.[11]

## II.    Plaintiff's TWCA Claim for Retaliation

In addition to bringing a disability discrimination claim, Plaintiff brings a claim for "wrongful/retaliatory discharge [] relating to his assertion of workers' compensation rights" under the TWCA, which can be found at Tenn. Code Ann. § 50–6–101 *et seq*. (Doc. No. 29 at 5). In 1984, the "[Tennessee] Supreme Court held that the Workers' Compensation Act prevented an employer from firing an employee in retaliation for filing a workers' compensation claim." *Thomason v. Better-Bilt Aluminum Prod., Inc*., 831 S.W.2d 291, 292 (Tenn. Ct. App. 1992) (citing *Clanton v. Cain–Sloan Co*., 677 S.W.2d 441 (Tenn. 1984)). The Tennessee Supreme Court explained that "a cause of action for retaliatory discharge, although not explicitly created by the statute, is necessary to enforce the duty of the employer, to secure the rights of the employee and to carry out the intention of the legislature." *Clanton*, 677 S.W.2d at 445.

Before the Court can consider the merits of Defendant's arguments in favor of summary judgment, it must first determine what substantive law to apply to Plaintiff's claims. With respect to that determination, Tennessee's choice-of-law rules will apply because in a diversity action, like the present case, the choice-of-law rules of the forum state are applicable. *See Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941); *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Under Tennessee's choice-of-law principles, tort actions, such as wrongful discharge claims, are governed by the "most significant relationship" approach. *See Nixon v. Waste*

---

[11] Defendant also challenged Plaintiff's ADA disability discrimination claim via argument related to steps two and three of *McDonnell Douglas*, which the Court need not consider in light of Plaintiff's failure to meet his burden at step one.

*Management, Inc.*, 156 F. App'x 784, 787 (6th Cir. 2005) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

> Under this approach, a tort action is governed by the law of the state with "the most significant relationship to the occurrence and the parties under the principles stated in § 6 [of the Restatement (Second) of Conflict of Laws]." Restatement (Second) of Conflict of Laws § 145(1). If the action is for personal injury, the law of the state where the injury occurred governs unless another state has "a more significant relationship under the principles stated in § 6 to the occurrence and the parties." *Id.* § 146.
>
> An analysis of which state has a more significant relationship to a dispute should consider
>
> "(a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
>
> (d) the place where the relationship, if any, between the parties is centered." *Id.* § 145(2).

*Id.* at 788.

As Plaintiff was hired by and worked for Defendant (and was domiciled) in Tennessee, and Tennessee was also the place where both his alleged injury and the conduct allegedly causing it (*i.e.* his separation from Defendant) occurred, it is readily apparent that Tennessee is the state with the most significant relationship, and thus its law will govern.

However, federal courts still apply federal procedural rules in evaluating state law claims in diversity cases. *See Gasperini v. Center for Humanities, Inc*., 518 U.S. 415, 427 (1996). And *McDonnell Douglas* is a "procedural device." *Snead v. Metro. Prop. & Cas. Ins. Co*., 237 F.3d 1080, 1092 (9th Cir. 2001) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 521 (1993)).

This means that federal courts evaluating TWCA retaliatory discharge claims[12] premised on indirect-evidence and governed by Tennessee law should "use the same burden-shifting framework" as outlined in *McDonnell Douglas*. *See Alexander v. Kellogg USA, Inc.*, F. App'x 496, 501 (6th Cir. 2017) (citing *Smith v. Bridgestone/Firestone, Inc*., 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999)); *see also Moling v. O'Reilly Auto., Inc*., 763 F. Supp. 2d 956, 978 (W.D. Tenn. 2011) (holding that *McDonnell Douglas* is the appropriate standard by which a federal court should evaluate a Tennessee state-law employment retaliation claim). As Plaintiff does not purport to have direct evidence of retaliatory discharge, his claims will be assessed under the indirect-evidence framework of *McDonnell Douglas*.

Defendant challenges Plaintiff's TWCA claim at step one, disputing Plaintiff's ability to make a *prima facie* showing of retaliatory discharge. The Sixth Circuit in *Alexander* stated:

> To establish a prima facie case for workers' compensation retaliation, the employee must show 1) he was an employee of the employer at the time of the injury, 2) the employee filed a workers' compensation claim against the employer, 3) the employer terminated the employee, and 4) the workers' compensation claim played a substantial role in the employer's decision to terminate the employee.

F. App'x 496 at 501 (citing *Yardley v. Hosp. Housekeeping Sys., LLC*, 470 S.W.3d 800, 805 (Tenn. 2015)); *see also Geronimo v. Caterpillar, Inc.,* 440 F. App'x 442, 446 (6th Cir. 2011) (citing *Anderson v. Standard Register Co*., 857 S.W.2d 555, 558 (Tenn. 1993)). Defendant specifically challenges Plaintiff's ability to raise a genuine issue as to the third and fourth elements, *i.e.*, that Plaintiff was terminated by Defendant, and that Plaintiff's claim for workers' compensation benefits was a substantial factor that motivated Defendant to terminate Plaintiff's employment. The Court will consider the challenge to each element in turn.

---

[12] Or claims under the TDA, as will be discussed later.

A.    A genuine issue exists as to whether Plaintiff was terminated.

Defendant first challenges Plaintiff's retaliatory discharge claim on the basis that he cannot prove he was terminated by Defendant. Defendant contends that Plaintiff was not terminated but was in fact processed "as a voluntary resignation following his violation of [Defendant's] Attendance Policy." Defendant points to the undisputed evidence of its Attendance Policy, which notes that "absence[s] without notice or notification will be considered a No call, no show." (Doc. No. 54-7 at 2). The policy also states that "[t]hree consecutive 'No Call No Show's' are considered a voluntary resignation by the employee." (*Id.*). Additionally, Defendant notes that it was under the impression that Plaintiff was released to return to work as a P&D driver on December 18, 2018 due to Dr. Baxter's IME report. (Doc. No. 54-9 at 4). It is also undisputed that on December 18th, Plaintiff was informed of his release to full-duty, and told his supervisor, Dodson, that he was going to return to work the following day. Additionally, Defendant cites to an email sent to Kuska where Kuska was told that Plaintiff said he would return to work at Central on December 19, 2018. (Doc. No. 54-14 at 3). Defendant then cites a declaration from Kuska where he explains he is the "only person authorized to approve PTO requests for drivers on light duty or workers' compensation statuses," and that Plaintiff never spoke with him about taking PTO from December 19th to the 21st. (Doc. No. 54-18 at 2-3). Defendant also points to another statement by Kuska, where he notes that, in accordance with company policy, Plaintiff's accrued PTO was paid shortly after his separation. (*Id.* at 3, 5). Finally, Defendant cites to Plaintiff's termination notice, which lists his termination as "voluntary" for not returning to full-duty work upon being released to do so. (Doc. No. 54-8 at 1).

To determine whether Defendant has pointed to enough evidence to successfully shift the burden on summary judgment to Plaintiff, the Court must consider whether Defendant's proffered

evidence suggests a lack of a genuine dispute as to whether Plaintiff voluntarily resigned (as opposed to being terminated by Defendant). "Under Tennessee law an employee's failure to take necessary and reasonable steps to protect his employment is treated as a voluntary resignation." *Cook v. SL Tennessee, LLC*, No. 3:13-CV-406, 2015 WL 796462, at *4 (E.D. Tenn. Feb. 25, 2015) (citing *McPherson v. Stokes*, 954 S.W.2d 749, 751 (Tenn. Ct. App. 1997) (involving a plaintiff who requested an extended leave of absence, and when it was denied, the plaintiff failed to report for work anyway)). But when an employee "make[s] some proactive effort to correct [a] misunderstanding" about the status of his employment, then he can be deemed to have taken the "necessary and reasonable steps to protect his employment." *Id. McPherson*, though involving a claim for unemployment benefits, provides some additional guidance on how Tennessee courts view voluntary resignations. 954 S.W.2d 749. *McPherson* states that "a voluntary act or failure to act with knowledge that termination may follow can be considered a voluntary leaving." *Id.* at 751. However, if an employer's "failure to inform [the employee] that [the employee's] leave is unacceptable leads [the employee] to believe that the leave is excused" then the employee will not be deemed to have voluntarily resigned. *Id.* at 752.

Here, Plaintiff contends that he requested PTO for the days in which Defendant says he was a no-call, no-show. Though Defendant offers evidence that Plaintiff's PTO was never approved, it does not offer evidence that Plaintiff was aware of the lack of approval and chose to take the leave anyway. Additionally, it is undisputed that Plaintiff returned to work at Central on December 26th, which suggest he was taking "necessary and reasonable steps to protect his employment." Though Defendant suggests that the Court should deem Plaintiff to have voluntarily resigned for purposes of the *applicable legal analysis* (into whether Defendant terminated Plaintiff as required by the third element of a retaliatory discharge claim) simply because Plaintiff would

be deemed *by Defendant's (self-serving) company policy to have voluntarily resigned*, Defendant offers no legal support for this suggestion.

For these reasons, the Court finds that Defendant has not met its initial burden of suggesting a lack of a genuine dispute as to the question of whether Plaintiff was terminated. Consequently, Defendant does not prevail on summary judgment at step one of *McDonnell Douglas* as to the third element of an indirect evidence *prima facie* case of retaliatory discharge.

    B.    <u>A genuine issue exists as to whether Plaintiff's workers' compensation claim was a substantial factor in his termination.</u>

Also at step one, Defendant challenges Plaintiff's ability to raise a genuine dispute that his claim for workers' compensation was a substantial factor in his ultimate (alleged) termination. "In order to meet the substantial factor requirement, a plaintiff must show either direct or 'compelling circumstantial evidence' of a causal connection between the workers' compensation claim and the termination, not just the fact that the latter followed the former." *Turner-Meadows v. Gen. Motors, LLC*, 786 F. App'x 592, 596 (6th Cir. 2019) (quoting *Frizzell v. Mohawk Indus.*, No. M2004-01598-COA-R3-CV, 2006 WL 1328773, 2006 Tenn. App. LEXIS 321 at *10 (Tenn. Ct. App. May 15, 2006)). The circumstantial evidence can come "in numerous forms" including:

> the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

*Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006). However, "[a]n employee may not rely 'on the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation.'" *Alexander*, 674 F. App'x 496 at 501 (quoting *Newcomb*, 222 S.W.3d at 391).

To shoulder its initial burden, Defendant points to the undisputed evidence that Plaintiff sustained an injury while working on August 15, 2016, and that his workers' compensation coverage started around the next day. This was over two years before Plaintiff separated from Central. Defendant also notes that Plaintiff received a variety of medical treatment for his injury, including physical therapy, MRIs, and surgery. (Doc. No. 54-6). Defendant states that in Plaintiff's deposition, when asked how Plaintiff knows he was fired because of his workers' compensation claim, Plaintiff said, "I don't see any other reason." (Doc. No. 54-1 at 51).[13]

A statement by a plaintiff that his only evidence of causation is that there can be no other reason for some event could, in some cases, suffice for a defendant to show (preliminarily, at least, subject to the plaintiff's response) a lack of genuine dispute as to that plaintiff's ability to show causation. *See Reed v. Alamo Rent-A-Car, Inc*., 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) ("[A] plaintiff cannot establish causation by testifying that she cannot think of any other reason for her discharge."). However, Defendant here left out some important context for the quote from Plaintiff's deposition. Plaintiff did not state only that he could see no other reason for his alleged termination. Instead, Plaintiff was asked, "Tell me now, how do you know that you were fired because of your work comp claim and for asking to see a back doctor?" (Doc. No. 54-1 at 51). To that, Plaintiff responded, "From all the evidence that we have here, I mean, the timecards, the letters. I don't see any other reason." (*Id.*). Because Plaintiff actively pointed to evidence that he

---

[13] Defendant argues that Plaintiff "has provided *no* evidence, much less compelling evidence, that his workers' compensation claim played any role" in him ultimately losing his job. (Doc. No. 52 at 20). This argument conceivably could aid Defendant in convincing the Court that Plaintiff has not met his burden (if ever Plaintiff were to bear this burden) to come forward with evidence sufficient to raise a genuine issue of material fact. But this argument is of no value in aiding Defendant to convince that Court that Defendant has made a preliminary showing that Plaintiff cannot raise a genuine issue of material fact; this is because unless and until Defendant makes such a showing, Plaintiff has no obligation to provide any evidence to show a genuine issue material fact, because the burden never shifted to Plaintiff to do so.

believed supported a causal connection between the workers' compensation claim and his alleged

termination, Defendant here should have addressed this identified evidence—the timecards and

letters—and explained why, contrary to Plaintiff's claim, it actually would not create a triable issue

of causation for the jury. However, Defendant has failed to do this, and therefore has failed to meet

its initial burden at step one of *McDonnell Douglas*. Not having had the burden shifted to him,

Plaintiff is not required to make an evidentiary showing of the causation element. Instead, the

Court will proceed to the second step of the analysis.[14]

C.   Defendant has presented evidence that it had a legitimate, non-retaliatory reason for Plaintiff's termination.

As noted, Defendant also attempts to obtain summary judgment at the second step of

*McDonnell Douglas*. Here, Defendant must show a legitimate, non-retaliatory reason for why

Plaintiff lost his job. As discussed above, Defendant contends that Plaintiff was never terminated,

but was actually "processed [] as a voluntary resignation following Plaintiff's no-call no-shows

after instructing him to return to work." (Doc. No. 52 at 22). As noted above, at this stage in the

---

[14] Based on the Court's findings that Defendant has not shown preliminarily the absence of a genuine issue of material fact as to whether Defendant terminated Plaintiff and whether there was a causal connection between such termination of Plaintiff's protected activity (filing a workers' compensation claim), the Court's discussion at step two (and, for that matter, step three) assumes *arguendo* (for ease of discussion) that Defendant did terminate Plaintiff and that Plaintiff has established a causal connection sufficient to support an indirect-evidence *prima facie* case of discrimination as required to survive step one of *McDonnell Douglas*. Notably, the fact that Plaintiff is credited with having established the causal connection necessary for Plaintiff to survive to step two does not mean that Defendant cannot effectively debunk any such causal connection at steps two and three; the Defendant can do exactly that if it shows that at the time of the termination it purported to have a legitimate and non-retaliatory reason for the termination and Plaintiff thereafter is unable to adduce sufficient evidence that such reason was in fact pretextual. *See Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 58399, at *68 (M.D. Tenn. Jan. 5, 2022) ("The burden of proof at the [indirect-evidence] *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity. What this means is that the real battle regarding causation often will occur not at the *prima facie* case (first) stage, but rather at the latter two stages." (citation and interna; quotation marks omitted)).

analysis, the Court assumes *arguendo* (consistent with Plaintiff's theory) that the reason for Plaintiff's separation was that Defendant terminated Plaintiff and not that Plaintiff voluntarily resigned; the question is whether Defendant at the time in question purported to have a reason for its termination of Plaintiff that was legitimate and non-retaliatory. Defendant claims that there was such a reason (although, as indicated, it couches this as a reason for treating Plaintiff as voluntarily resigning and not as a reason for terminating Plaintiff); according to Defendant, the reason for the separation (which, again, the Court treats here as Plaintiff's *termination* by Defendant) was that Plaintiff failed for three straight days either to show up for work or to call in when he was required to do so.

As discussed above, Defendant points to sufficient evidence—such as the Attendance Policy (Doc. No. 54-7 at 2), Kuska's declaration (Doc. No. 54-18 at 2-3), and Plaintiff's termination notice (Doc. No. 54-8 at 1)—to show that Plaintiff's three alleged no-call, no-shows were purported by Defendant, *at the time* Plaintiff's employment ended, to be the reason why it ended.[15]

---

[15] Defendant also argues that Plaintiff was unable to "perform the essential functions of his job at the time of his separation," which is a legitimate reason to terminate an individual under Tennessee law. (Doc. No. 52 at 22 (citing *Ellis*, 2007 WL 1464594, at *9)). However, as the undersigned has recently noted,

> [A] defendant is required to show with *introduced evidence* its reasons for the plaintiff's [alleged termination], that necessarily means two things: (i) the reason shown must be the *actual purported reason for the rejection at the time of the decision*, because that (and not some post-hoc speculation as to what the reason surely must have been) is what would be shown via *admissible evidence*; and (ii) the required showing cannot be made via attorney's statement in briefings as to what the reason was (or surely must have been), because attorney's statements are quintessentially not admissible evidence.

*Thomas v. Clarksville Montgomery Cty. Sch. Sys.*, No. 3:19-CV-00956, 2022 WL 1129643, at *6 (M.D. Tenn. Apr. 15, 2022). Defendant has provided no evidence that Plaintiff's inability to perform the essential functions of the P&D driver position was the reason for Plaintiff's alleged termination *at the time* his employment ended, and had Defendant done so, it would be directly contradicting Defendant's other purported reason for ending Plaintiff's employment: that Defendant believed Plaintiff was released to full-duty work and didn't show up for three days. Defendant could not simultaneously be under the belief that

Moreover, such a reason is a legitimate and non-retaliatory reason. "The Tennessee Supreme Court has stated repeatedly, if an employer-defendant has a global and neutral policy, i.e. an absenteeism policy, and applies it in a non-discriminatory manner to discharge a plaintiff, no retaliation claim will prevail." *Ellis v. Buzzi Unicem USA*, No. 1:06CV96, 2007 WL 1464594, at *9 (E.D. Tenn. May 16, 2007), *aff'd*, 293 F. App'x 365 (6th Cir. 2008) (citing *Anderson v. Standard Reg. Co*., 857 S.W.2d 555, 559 (Tenn. 1993) (*abrogated on other grounds*)); *see also Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 403 (6th Cir. 2019) (holding that twelve unexcused absences was a legitimate, non-discriminatory reason for terminating an individual's employment); *Alexander v. Kellogg USA, Inc*., No. 215CV02158STATMP, 2016 WL 1058110, at *13 (W.D. Tenn. Mar. 14, 2016), *aff'd*, 674 F. App'x 496 (6th Cir. 2017) ("Furthermore, even if Plaintiff had established a prima facie claim, Kellogg has presented a legitimate non-retaliatory reason for Plaintiff's termination, i.e., noncompliance with its attendance policy. . .").

As Defendant has successfully provided a legitimate, non-retaliatory reason for why Plaintiff was terminated—that Plaintiff did not show up to work for three days on which he was expected to work, without calling in—the analysis moves to step three of *McDonnell Douglas*, at which the burden shifts to Plaintiff to prove that this given reason is pretextual. The undersigned has previously explained,

> [O]nce the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch*., 974 F.3d 652, 661 (6th Cir. 2020)). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant

---

Plaintiff was capable of returning to his full-duty position and that Plaintiff could not perform the essential functions of said position. For these reasons, the Court will not consider Defendant's statement that Plaintiff was unable to perform the essential functions of his position as Defendant's legitimate, non-retaliatory reason for Plaintiff's termination.

intentionally discriminated against him. *Braithwaite v. Tinken Co*., 258 F.3d 488, 493 (6th Cir. 2001).

> An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).
>
> ...
> In some cases, the evidence that the defendant's proffered reason was not the [actual] reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason.

*Benitez v. Tyson Fresh Meats, Inc*., No. 3:18-CV-00491, 2022 WL 58399, at *20 (M.D. Tenn. Jan. 5, 2022).[16]

Though Plaintiff correctly identifies the standard for establishing pretext, it is difficult to identify any substantive argument Plaintiff makes to demonstrate that Defendant's given reason is pretextual. In his Response, Plaintiff has replied to all of Defendant's arguments related to his retaliatory discharge claim in one unorganized section without giving any thought to dividing arguments or evidence to correspond to the portions of Defendant's argument that they are actually meant to address. However, the Court will address, in connection with the issue of pretext, those arguments that it *thinks* Plaintiff may have intended to be relevant to the issue of pretext. Plaintiff first argues (or appears to argue) that Central's reliance on Dr. Baxter's IME report was without "legal justification or status" under Tennessee workers' compensation law. (Doc. No. 60 at 11-12). Plaintiff then brings up Defendant's initial unwillingness to pay temporary disability benefits.

---

[16] In the original, "[actual]" read "proffered." This was in error, as the undersigned clearly meant "actual" (or "real") here, and the undersigned issued an amended opinion to correct this.

(*Id.* at 12-13). Plaintiff may also have intended his previously discussed argument that he was being monitored by Kuska (who was allegedly "waiting" for a reason to terminate him) to also function as an argument for the existence of pretext. (*Id*. at 18). Finally, it seems possible that Plaintiff intended the evidence that Skelley thought Plaintiff was a good worker with no previous disciplinary issues, to also demonstrate pretext. (*Id.* at 16).

Much of this cited evidence (the reference to the IME report and Defendant's unwillingness to pay disability benefits) seems entirely irrelevant to whether Defendant's reasons for terminating Plaintiff were pretextual. As for the argument that Plaintiff was being monitored, Plaintiff provides no actual evidence of such monitoring, other than the fact that Kuska contacted Plaintiff's supervisor on the days he did not show up to work. (*Id.* at 18). The only argument that appears to be both supported with evidence and potentially relevant to the question of pretext is the argument that Plaintiff was a good worker, which could theoretically act as evidence that Defendant's stated reason for ending Plaintiff's employment was insufficient in light of Plaintiff's positive work history. However, this fragment of evidence certainly falls below the standard of allowing a jury to reject Defendant's legitimate, non-retaliatory reason for Plaintiff's alleged termination, especially because it is very conceivable that even a "good" worker would be terminated for being a no-show three days in a row (at which point the worker would tend to start looking not so good after all).

Accordingly, Defendant prevails at the latter steps of the *McDonnell Douglas* analysis as to Plaintiff's TWCA claim for retaliatory discharge.

## III.     Plaintiff's TDA Claim for Disability Discrimination

The TDA "prohibits private employers from discriminating against employees 'based solely upon any physical, mental or visual disability of the applicant, unless such disability to some

degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.'" *Bennett v. Nissan N. Am., Inc*., 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009) (quoting Tenn. Code Ann. § 8–50–103(b)). To prevail on a claim of disability discrimination under the TDA, a plaintiff must show "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability." *Id.* (citing *Barnes v. Goodyear Tire & Rubber Co*., 48 S.W.3d 698, 705 (Tenn. 2000), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010)). Under the TDA, to be qualified, an individual "must (1) possess the requisite skill, education, experience, and training for the position; and (2) be able to perform the essential job functions." *Black v. City of Clarksville*, No. M202001580COAR3CV, 2022 WL 122615, at *5 (Tenn. Ct. App. Jan. 13, 2022). Unlike the ADA, the TDA does not have a "reasonable accommodation" component, meaning, "[i]f a claimant needs an accommodation to be capable of performing the essential functions of the position, the claimant is not considered to be qualified for the job and may not look to the TDA for protection." *Id.*

As noted above, the Court informed Plaintiff it was considering granting summary judgment *sua sponte as to* his TDA claim on the grounds that he could not raise a genuine issue [17] as to the first element, *i.e.*, that Plaintiff was qualified to perform the essential functions of the job.

---

[17] As noted above, Tennessee disability discrimination claims do not have reasonable accommodation requirements. *See Black*, 2022 WL 122615, at *5. Otherwise, "[b]oth federal and Tennessee disability discrimination actions require the same analysis." *Nance v. Goodyear Tire & Rubber Co*., 527 F.3d 539, 553 n.5 (6th Cir. 2008) (citation omitted). This means that the *McDonnell Douglas* burden-shifting framework applies to claims of disability discrimination under the TDA if they are premised on indirect evidence. As with his other claims, Plaintiff does not purport to have direct evidence of disability discrimination, and the Court did not find any in its review. Thus, Plaintiff's TDA claim will proceed under the *McDonnell Douglas* framework. The Court here is considering granting summary judgment *sua sponte* based only on the results of the first step of the framework, *i.e.,* Plaintiff's ability to establish an indirect-evidence *prima facie* case of disability discrimination under the TDA.

(Doc. No. 66).[18] As for why it was skeptical that Plaintiff could make a sufficient evidentiary showing of being qualified to perform the P&D driver position, the Court notes that Plaintiff accepted as undisputed the following fact from Defendant's Statement of Undisputed Material Facts: "At the time of Plaintiff's separation, he was unable to drive a truck or perform the essential functions of his job due to his medical restrictions and limitations." (Doc. No. 61 at 23). The Court also notes that Plaintiff's Complaint states that although he was not capable of performing the essential functions of his employment at the time of his separation, he would be thus capable "once he was able to complete the medically necessary treatment." (Doc. No. 29 at 7). In addition, Plaintiff testified that at the time of his separation in December 2018, he was not able to drive a truck, which as noted in the previous discussion of Plaintiff's ADA claim is an essential function of his position as a P&D driver. (Doc. No. 54-1 at 40-41).

Plaintiff argues that "the conflicting positions Defendant takes" create a genuine dispute as to whether or not he could perform the essential functions of the P&D driver position at the time of his alleged termination. (Doc. No. 67 at 17). Plaintiff cites to Kuska's deposition where Kuska notes that Plaintiff stopped receiving "comp benefits because he had been released to his regular duties." (Doc. No. 68-17 at 14). Plaintiff also cites to an email from Kuska to Dodson on December 18, 2018, which states that Plaintiff was released to return to work in a full-duty status. (Doc. No.

---

[18] The Court herein is considering summary judgment for Defendant on Plaintiff's TDA claim on a basis that mirrors the one advanced in Defendant's Motion as to Plaintiff's ADA claim: that Plaintiff cannot raise a genuine issue as to whether he is a qualified individual, because he cannot show that he could complete the essential functions of the P&D driver position. And as discussed above, Plaintiff failed to even address Defendant's argument related to his ability to perform the essential functions of his position. However, consistent with the Sixth Circuit's approach to courts' raising *sua sponte* grounds for summary judgment, the Court provided Plaintiff with an additional opportunity to provide responsive briefing as to the TDA claim only. As a result, Plaintiff did provide responsive briefing to the Court's *sua sponte* notice that it was unsure whether Plaintiff had sufficient evidence to reach a jury on the issue of whether he was a qualified individual under the TDA, even though he failed to respond to Defendant's similar argument made earlier with respect to Plaintiff's ADA claim.

68-4 at 2). Plaintiff additionally argues that though he "was still disabled" at the time he received the call from Gehringer purporting to release him to full-duty work, he is entitled to "an inference that he would have been able to perform the essential functions of his employment position even though he was disabled." (Doc. No. 67 at 18-19).

To support his argument, Plaintiff cites to this Court's opinion in *Stinson v. Nissan North America, Inc.*, which involved a plaintiff with an "outstretched reaching" restriction due to a shoulder injury, who continued to work at his position with no issues after receiving the restriction. No. 3:18-CV-0145, 2019 WL 6174841, at *1 (M.D. Tenn. Nov. 20, 2019). Plaintiff argues that he is "entitled to the inference that he would have been able to successfully return to work in spite of his restrictions just as Mr. Stinson did." (Doc. No. 67 at 20). However, this argument misunderstands the Court's holding. In *Stinson*, this Court held that the plaintiff had raised a genuine issue of material fact "as to whether the essential functions of [Stinson's] job were outside his work restrictions" and that "[t]hose issues of fact preclude summary judgment for [the d]efendant on the basis that [the p]laintiff was not 'otherwise qualified.'" 2019 WL 6174841, at *12. Additionally, the Court grounded this holding on the fact that the plaintiff in *Stinson* had produced evidence showing he had performed his job for ten years with no complaints *after* receiving his injury restrictions.

The facts in the present case are starkly different. Here, it is undisputed that Plaintiff had not performed any of the job duties of a P&D driver from the date of his injury through the end of his employment. (Doc. No. 61 at 23). Moreover, unlike *Stinson*, the present case does not involve a dispute as to whether Plaintiff's restricted activities (driving and lifting) are actually essential functions of the P&D driver position, rather the dispute here is whether Plaintiff could perform those essential functions in spite of his restrictions (or with his restrictions lifted). Finally, a

plaintiff's desire to return to work or belief that they could perform the job in spite of restrictions or disability does not make a plaintiff a qualified individual under the TDA. *See Black*, 2022 WL 122615, at *8 (citing *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 603 (7th Cir. 1999) ("Koshinski may have shown that he wanted to return to work despite the risk of pain and harm, but that is not the test. He had to show that he was qualified to do the job."))

Moreover, Plaintiff's contention that he was a qualified individual under the TDA because the Court should infer he could perform the essential functions of the P&D driver position contradicts Plaintiff's own repeated acknowledgments that he was unable to perform the essential functions of the position. And the Tennessee courts have previously held that a plaintiff's evidence that she could perform a job can be "entirely discredited by her own prior statements." *Black*, 2022 WL 122615, at *8; *see also Taylor v. AutoAlliance Intern. Inc.*, No. 08-cv-11318, 2009 WL 2591533, at *7 (E.D. Mich. Aug. 24, 2009) ("Plaintiff's personal belief is insufficient to create a question of material fact when severely undermined by her own previous statements. . . .") (cited positively by *Black*, No. M202001580COAR3CV, at *7); *Hilliard v. Dolgencorp, LLC*, No. E201800312COAR3CV, 2019 WL 1377263, at *14 (Tenn. Ct. App. Mar. 26, 2019) ("Plaintiff admitted that she cannot perform the essential job function . . . [and a]s such, Plaintiff has failed to show that she is qualified for the position of store manager.").

And Plaintiff's evidence that he could perform the essential functions of the P&D driver position is minimal to begin with. The only such evidence to which he points is various statements from Kuska, who was himself relying on information from Cherokee that Plaintiff had been released to full-duty. Kuska is not a medical professional and, for that matter, not Plaintiff's work supervisor. He is simply the individual with Defendant responsible for processing workers' compensation claims. (Doc. Nos. 60 at 14; 64 at 16). Kuska's statements alone, when contrasted

with the numerous admissions from Plaintiff that he could not perform the essential functions of his position, are insufficient to raise a genuine dispute as to the question of whether Plaintiff could perform the essential functions of a P&D driver. *See Scott v. Harris,* 550 U.S. 372, 379–80 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Even in the very brief where Plaintiff is meant to be defending the notion that he is a qualified individual under the TDA because (supposedly) he could perform the essential functions of the P&D driver position, Plaintiff appears to acknowledge that he was, in fact, not able to perform the essential functions. In his TDA brief, Plaintiff notes that he was "not at MMI ["Maximum Medical Improvement"] for his back on December 18, 2018, because he had received no treatment for his back" (Doc. No. 67 at 12), and that it was "Plaintiff's opinion that he was unable to perform the essential duties of a P&D driver during 2018." (*Id.* at 17).

For these reasons, the Court finds that Plaintiff has failed to carry his burden of showing that a reasonable jury could find that he was a qualified individual under the TDA. Accordingly, the Court will grant summary judgment as to Plaintiff's TDA claim *sua sponte*.

## CONCLUSION

Defendant's Motion sought summary judgment with respect to two (and only two) of Plaintiff's causes of action: his claim for ADA disability discrimination and his claim for TWCA retaliatory discharge. For the reasons stated herein, the Motion will be **GRANTED,** and summary judgment will be entered in Defendant's favor on Plaintiff's claim for ADA disability discrimination and Plaintiff's claim for TWCA retaliatory discharge.

Additionally, the Court will **GRANT** summary judgment *sua sponte* as to Plaintiff's third and final cause of action, his claim for disability discrimination in violation of the Tennessee Disability Act

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE